**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RAYMOND PELZER,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 07-38** |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                    **August 31, 2009**

Raymond Pelzer was shot and killed by Officer Burton on April 27, 2006, after running from police officers who had stopped him for non-violent illegal activity. Pursuant to 42 U.S.C. § 1983 and state law, Leslie Pelzer, individually and in her role as administratrix of the estate of her son, Raymond Pelzer, initiated this action against Philadelphia Police Officer Marvin Burton, Police Commissioner Sylvester Johnson, and the City of Philadelphia (City).

Ms. Pelzer's complaint consists of seven counts: (I) Fourth Amendment excessive force claim against Burton; (II) Civil battery against Burton; (III) Civil assault against Burton; (IV) Failure to train against the City and Commissioner Johnson; (V) Monell claim against the City and Commissioner Johnson; (VI) Wrongful death; and (VII) Survival.  (See Compl.¶¶ 35–60 (Document #1).)  The defendants have moved for summary judgment on all counts.  After careful consideration of the parties' memoranda and the record, I will grant the motion in part and deny it in part.

## I. Background

### A. Officer Burton's training

Officer Marvin Burton entered the Philadelphia Police Academy in April of 2003 and graduated in November that same year.  (Defs.' and Pl.'s Statement of Facts ¶ 1 [hereinafter SOF]; Philadelphia Police Officer Marvin Burton Dep. 10:4–14, Mar. 13, 2008.)  As of April 2006, he had been serving for approximately two and one-half years as an officer.  The Pelzer shooting was Officer Burton's first firearm discharge incident.[1] (Burton Dep. 41:18–21.)

The Academy training curriculum is composed of courses mandated by either the Philadelphia Police Department (Department) or the Municipal Police Officers' Education & Training Commission (MPOETC).  (SOF ¶ 2.)  Two of the areas covered during training are the use of force and police patrol procedures.  (Id. ¶¶ 2, 6.)

### i. Use of force training

Officer Burton was trained to use force in accordance with Department Directives 10 and 22.  (Id. ¶ 2; Burton Dep. 11:16–12:9.)  Department Directive 10 covers the use of deadly force.  The officer's primary duty is "to preserve human life."  (Defs.' Mem. for Summ. J. Ex. F (Philadelphia Police Department Directive 10) at 1.)  To that end, deadly force is only to be used when officers "reasonably believe they must protect themselves or another person present from imminent death or serious bodily injury."  (Id.)  "[A]ll other

---

[1] As of his March 2008 deposition, Burton stated he had not been involved in another firearm discharge incident since the Pelzer shooting.  (Burton Dep. 41:18–23.)

reasonable means of apprehension and control" must be exhausted "before resorting to the use of deadly force."  (Id.)

Officers are not to "unreasonably endanger themselves" in applying Directive 10. (Id.)  Similarly, officers should "ensure their actions do not precipitate the use of deadly force by placing themselves or others in jeopardy by taking unnecessary, overly aggressive, or improper actions."  (Id. at 2.)  Their firearms should be drawn only when they "believe a potential for serious bodily injury or imminent death to [themselves] or another person exists."  (Id. at 3.)

Directive 22 covers the general use of force.[2]  Described as the "force continuum," the directive provides guidelines to help officers determine what level of force is necessary and appropriate for gaining control of suspects and stopping threatening actions.  (See Defs.' Mem. for Summ. J. Ex. G (MPOETC teaching materials on use of force by law enforcement) at 19.)  In other words, it teaches "a logical progression through the stages of force."  (See id. at 20.)  When responding to the threat imposed by a subject, the officer must assess the situation and decide what force would be appropriate, which may consist of mere presence, verbal direction, various kinds of non-deadly force, or deadly force, if necessary.  (Id.)

Not only may the officer's use of force escalate with the suspect's actions, it must also de-escalate appropriately.  (Id. at 21.)  For example, when an individual physically

---

[2] The text of this directive was not provided by the parties, but its teachings are generally described in the Academy materials entered into the record.

resists arrest, the officer may use appropriate force to gain control.  If the individual

ceases to resist, the officer must accordingly respond and de-escalate his use of force to

reflect the individual's changed conduct.

In determining what amount of force or control is reasonable under the

circumstances, the force continuum provides that "[t]he single most important factor [to

consider]. . . is the suspect's actions."  (Id.)  Is the suspect verbally resisting?  Physically?

If physically, is the resistance defensive or offensive?  Does the resistance pose a threat of

serious bodily injury or death?  (Id. at 20–21.)  The officer is also directed to consider the

nature of the suspect's offense, the actions of third parties, his own physical condition, the

feasibility of force alternatives, and the surrounding environment.  (Id. at 19.)

### ii. Patrol procedures training

Because foot pursuits tend to be "strong in emotion, weak in tactics," police

recruits are given basic training on how to conduct them.  (See Defs.' Mem. for Summ. J.

Ex. L (MPOETC materials on patrol procedures) at 29.)  With respect to patrol

procedures, the materials primarily emphasize the need to follow department policy.  (Id.)

The Department has repeatedly admitted it has no policy on foot pursuits.

Officers are also instructed to consider a number of factors regarding themselves,[3]

---

[3] Officers should consider whether they are wearing a ballistic vest and whether they are
physically fit and able to handle the individual.  (Defs.' Mem. for Summ. J. Ex. M (MPOETC curriculum
on principles of criminal investigation) at 29.)

the individual,[4] the circumstances giving rise to the need to pursue,[5] and the local

environment[6] before deciding to pursue.  (See Defs.' Mem. for Summ. J. Ex. M

(MPOETC materials on principles of criminal investigation) at 29–30.)   The officer is

also advised to maintain a proper distance so as to disengage if necessary, and not to split

from other officers in the unit.  (Id. at 31.)

These considerations are not meant to provide clear answers on when or when not

to pursue.  The Department appears to leave the decisions regarding foot pursuits to the

individual officer's discretion in light of his or her training and experience.[7]

---

[4] Considerations include who the subject is, whether the officer knows the subject or where the
subject lives, whether a safety pat-down had been conducted, and whether the individual has known
violent tendencies.  (Id.)

[5] In terms of the underlying circumstances, officers should consider what crime the subject has
committed and whether the risks of pursuit are worth apprehension.  (Id. at 30.)

[6] The officer should consider whether the pursuit will take place in a crowded area, whether he or
she knows the area, and whether the environment will allow the officer to keep the subject in sight.  (Id.)

[7] The deposition testimony of Sergeant Alfredo Lopez, a Philadelphia police instructor on patrol
procedures, indicates as much.  (Sgt. Alfredo Lopez Dep. 21:11–15, Aug. 6, 2008 ("[The MPOETC
pursuit considerations are] not a checklist.  'Cause every situation is fluid, every situation is different,
every person is different.  These are just some things they should keep in mind."); id. 22:6–12 ("[T]here
is no cookie-cutter answer for when to pursue or when not to pursue.  Every situation is different.  Every
person is different.  Every officer is different.  Their experience level[,] their training's different.  They
have to decide for themselves, 'Is the foot pursuit worth pursuing?  Is the apprehension worth
apprehending?'").)
When asked by plaintiff's counsel about why the Department does not have a foot pursuit policy,
Commissioner Sylvester Johnson gave a similar response: "I think [foot pursuits are] spontaneous. . . . I
don't see how a policy could tell you who you should chase, how long you should chase them. . . .
[O]fficers who have been through 6 or 7 months of training should use common sense.  I think common
sense should tell them how to proceed."  (Comm'r Sylvester Johnson Dep. 36:12, 37:3–5, 37:16–20,
Nov. 24, 2008.)

**B. The Office of Integrity and Accountability's Officer Involved Shooting Report**

The Integrity and Accountability Office (IAO) of the Philadelphia Police Department was established in 1996 to evaluate and report on the Department's operations.  (Pl.'s Supplemental Statement of Facts ¶ 1 [hereinafter Pl.'s Supp. SOF].) Based on these evaluations, recommendations for changes in policies or procedures were made.  (Id. ¶ 3.)

In 2005, the IAO released a report entitled "Officer Involved Shootings," which was authored by then-director Ellen Green-Ceisler.[8]  (Id. ¶¶ 5–6.)  The report was the product of a year-long study of officer-involved shootings from 1998 to 2003.  ELLEN GREEN-CEISLER, INTEGRITY AND ACCOUNTABILITY OFFICE, OFFICER-INVOLVED SHOOTINGS 1–2 (2005) (attached as Exhibit Z to Defs.' Reply to Pl.'s Opp'n Mem. (Document #5)) [hereinafter Ceisler, IAO Report].  Its purpose was to "assess whether the [Philadelphia Police Department] has effective and meaningful policies and practices in place to insure that deadly force is only used as authorized by law and policy and that when it is not, that the [Philadelphia Police Department] takes all reasonable and necessary measures to address" the use of deadly force.  Id. at 2.

**1. Statistical findings regarding officer-involved shootings**

The report's statistics indicate 759 Philadelphia police officers discharged their weapons in a total of 596 shooting incidents from 1998 to 2003.  Id. at 6.  In 285 of these

---

[8] Ms. Ceisler now serves as a judge for the Court of Common Pleas for Philadelphia County.

incidents, officers fired their weapons at one or more individuals.  Id.  The remaining 311 incidents involved "shootings at dogs and accidental discharges."[9]  Id.

During the same five-year period, 35 civilians were killed and 116 wounded as a result of officer-involved shootings.  Id. at 11.  Of the 35 civilians killed, 22 were armed with guns and had either shot at or pointed their guns at the officer(s) and 7 were armed with knives or other blunt force objects.  Id.  The remaining six civilians killed were unarmed.  Id. at 13.

In highlighting these numbers, the report made no attempt to determine the reasonableness of individual shootings.  Id. at 2.  That responsibility was vested in the Department "as manifested in the Department's 'use of force' reporting and investigation policies and practices."  Id.  As a result, "[t]he extent to which the officer-involved shootings that resulted in fatalities are excessive or unreasonable cannot be determined from these raw statistics alone."  Id. at 14.

### 2. Findings and suggestions regarding Philadelphia police tactics

One section of the report focused on police tactics and judgment and how they influenced the number of officer-involved shootings.  It presented the key finding that Philadelphia officers were using "[q]uestionable tactics and judgment," thereby "increasing the likelihood and precipitating the need to use deadly force when other less

---

[9] There is a numerical inconsistency in the IAO report.  The sum of the total number of discharges at dogs and accidental shootings is 315.  The difference between the total number of shooting incidents (596) and the number of intentional discharges at suspects (285) is 311.  I have not been able to account for the four-incident discrepancy.

dangerous responses are available." Id. at 55.  Among the problems identified were

failures to notify Police Radio, request assistance, seek protective cover, or maintain safe

distances when pursuing an individual.  Id. at 59.

The report also found evidence of an "accepted and common practice" called

"partner-splitting."  Id. at 59–60.  Described as "an ineffective and an unacceptably high

risk tactic," partner splitting is the deliberate decision of a two-officer team to split up and

pursue a suspect.  Id.  A "dangerous variant" is when an officer team splits up so that one

officer exits the patrol car to pursue on foot while the other officer drives ahead to cut off

the suspect using the vehicle.  Id.  Whether the partners are on foot or in a vehicle,

partner-splitting can be dangerous because it leads to loss of visual contact between the

officers, a decreased ability to communicate or assist each other, and an increase in the

danger that the officers or civilians will get caught in a cross-fire situation.  Id. at 60.

Because 48% of intentional shooting incidents occurred during or were preceded

by foot pursuits, the report believed the situation "warrant[ed] closer attention."  Id. at 62.

It identified four factors influencing Philadelphia police officers' decisions when

pursuing on foot: peer pressure, the Department's system of rewards and incentives,

inadequate training, and "the John Wayne syndrome."  Id. at 61.  To combat these

dangerous influences on officer decisionmaking, the report recommended instituting

policies providing greater guidance on when to engage and pursue.  Id. at 62–63.  In

particular, the Department was encouraged to instruct officers not to engage in foot

pursuits if:

> 1. The officer is alone and the suspect is known or believed to be armed, unless the suspect presents an imminent threat of serious harm to others;
>
> 2. The officer(s) lose sight of a fleeing suspect, in which case the foot pursuits must be terminated in favor of containment efforts;
>
> 3. The officer has no means of communicating with Police Radio or other officers.

Id.  It was hoped these instructions would decrease the probability of officers placing themselves in situations "virtually assuring . . . deadly force would be [their] only option if the situation escalated."  Id. at 60.  Additionally, the report recommended officers be trained to consider various factors, such as the nature of the offense and the area involved, before deciding to pursue an individual.  Id.

**C. Events of April 27, 2006**

Around 5:34 p.m. on April 27, 2006, Philadelphia Police Officers Kenora Whitmore[10] and Jorge Soto conducted a pedestrian stop of Raymond Pelzer and two other males at the intersection of Millick Street and Market Street.  (SOF ¶ 39.)  Officers Whitmore and Soto patted all three individuals down and had no reason to believe any were armed.  (Phila. Police Officer Kenora Whitmore Dep. 43:24–44:16, Apr. 10, 2008.)  The officer asked the men to provide identification and proceeded to relay their names

---

[10] During the time since this incident, Officer Kenora Whitmore has been promoted to the position of Sergeant and changed her surname to Henderson.  This memorandum will continue to refer to her as Officer Whitmore.

and dates of birth over the radio to see if there were any outstanding warrants.  (Id. 46:9–20.)

Unbeknownst to Officer Whitmore, Pelzer was wanted as an absconder.  Just as Whitmore was about to learn this piece of information, Pelzer began to run north on Millick towards Arch Street.  (Id. 47:16–23; SOF ¶ 39.)  Whitmore gave out flash information over the police radio describing Mr. Pelzer as a black male wearing a white shirt and blue Dickies pants; she also broadcast his home address.  (SOF ¶ 41.)  She did not radio what Pelzer was wanted for or that he had already been frisked.  (Whitmore Dep. 50:2–52:24.)

Within a minute or so of the radio flash, Officer Miguel Curet and his partner spotted Pelzer running down the 5900 block of Filbert Street towards Salford Street.  (Id. ¶ 42.)  Officer Curet and his partner then lost sight of Pelzer and radioed that he must have gone through an alley on Redfield Street.  (Id. ¶ 43.)  Officer Curet exited the vehicle and began to walk north on Redfield while his partner remained on Filbert.  (Id. ¶ 44.)  Walking up about a half-block, Officer Curet turned into an alleyway to cut Pelzer off.  (Id. ¶ 45.)

Around the same time, Officer Marvin Burton and his partner were on patrol in the area in an emergency patrol wagon.  (Burton Dep. 45:21–23.)  Upon receiving Officer Whitmore's radio flash, Officer Burton and his partner drove to the general area where Pelzer was last seen.  (Pl.'s and Defs.' Supplemental Statement of Facts ¶ 51 [hereinafter

Supp. SOF].)  Burton decided to split from his partner and pursued on foot; he directed his partner to drive the vehicle to Filbert in order to cut off Pelzer.  (Id.)

Upon learning Pelzer was spotted in an alleyway running between Salford and Redfield, Burton turned south from Arch onto Salford.  (SOF ¶ 48.)  Approaching the alleyway's opening onto Salford, Burton saw Pelzer attempting to climb over the inside part of the alleyway entrance gate located on the north side of 51 North Salford Street. (Id.)  Upon making eye contact with Burton, Pelzer dropped down from the gate and ran back into the alley towards the rear of the 51 North Salford residence.  (Id. ¶ 49.)  Burton lost visual contact as Pelzer ran into the backyard of the building, but he decided to follow anyway.  (Id. ¶ 51.)

As Pelzer ran away, Burton noticed that Pelzer's right hand was on his waistband area.  (Id. ¶ 50.)  Burton thought it was out of the ordinary and suspected Pelzer was "trying to hold something from falling out of his waist."  (Burton Dep. 113:5–23.) Believing Pelzer might be armed, Burton drew his gun as a precaution "because [he] didn't know what was waiting for [him] around the corner after [he] lost sight of [Pelzer]."  (Supp. SOF ¶ 68; see also Burton Dep. 137:14:22.)  He did not learn until later that Pelzer was in fact unarmed.

Peeking around the corner of the building, Burton saw Pelzer attempting to climb over another gate connecting the backyard to another alleyway, which was perpendicular to the one he had just run down.  (SOF ¶ 52.)  Burton stepped away from the corner of the

building and into the backyard.  (Id. ¶ 53.)  He told Pelzer to stop and that he had been

running long enough.  (Id. ¶ 53.)  Pelzer came off the fence and turned to face Burton.

Though he was looking directly at the officer, Pelzer positioned his body such that his left

side was towards the officer and his right side was away.  At this point, Burton's gun was

trained on Pelzer who had begun to yell obscenities and told Burton, "Do it!  Do it!"

During this time, Officer Curet was approaching the 51 North Salford backyard

from an east-west alley running from Redfield Street.  (Id. ¶ 57.)  A blue tarp was hanging

from a fence between him and the area where Burton and Pelzer were standing.[11]  With

his gun drawn, Curet began moving forward and gave several orders for Pelzer to show

his hands.  (See Phila. Police Officer Miguel Curet Dep. 54:15–58:2, 80:1–6, Mar. 14,

2008.)  While Curet was approaching the two, he heard a gun shot.  He was initially

unsure of who fired the shot, but knew it was Burton when he saw Pelzer fall.  (Id.

86:22–87:2, 88:23–89:17.)

Several facts leading up to the shooting are in dispute.  First, the parties disagree

over where Pelzer's hands were after he came off the fence and faced Burton.  Officer

Burton stated that Pelzer kept his right hand hidden beneath his shirt and was rocking

back and forth.  (Defs.' Statement of Facts ¶ 56.)  The plaintiff argues that Pelzer's hands

were kept at his sides and were visible at all times.  (Pl.'s Statement of Facts ¶ 56.)

Second, the parties dispute whether Pelzer made any sudden movements before he

---

[11] The distances between Pelzer, this tarp and Officer Curet were not made clear in the record.

was shot.  Officer Burton testified that Pelzer thrust his right hand forward while holding

a metallic-looking object.[12]  (Defs.' Statement of Facts ¶ 61.)  Believing that Pelzer was

holding a gun and intended to shoot him, Officer Burton fired one shot.  (Id.)  The

plaintiff has presented potentially contradictory testimony by Officer Curet suggesting

Pelzer made no movements up until the moment Burton shot him.  (Pl.'s Statement of

Facts ¶ 61.)

Third, the parties dispute what Officer Curet was able to see because of the blue

tarp.  Some parts of the officer's deposition suggests he was able to see Pelzer's entire

body while other sections appear to indicate his view was limited to the top and bottom of

Pelzer's body, not the middle portion.

### D. Post-shooting events

The Philadelphia District Attorney's Office, the Internal Affairs Shooting Team,

and the Firearms Discharge Review Board each investigated the shooting.  (SOF ¶¶

64–65.)  In an October 19, 2007 letter, the District Attorney's Office notified the

Department that its investigation found Officer Burton's conduct to be justified under

Pennsylvania law.  (See Defs.' Mem. for Summ. J. Ex. X (October 19, 2007 from District

Attorney Lynne Abraham to Commissioner Johnson).)  The Shooting Team and the

Discharge Review Board also conducted their own investigations and independently

determined Burton's use of deadly force was within the scope of Directive 10.  (See id.

---

[12] It was later determined that Pelzer had been holding a cellular phone.

-13-

Ex. W (December 4, 2007 Internal Affairs Shooting Team report); id. Ex. Y (Firearms

Discharge Review Board report).)  There was no recommendation that Burton be given

further firearms instruction.

### E. The Williams report

The plaintiff has submitted a report written by James A. Williams, a law

enforcement policy, practice, and procedure consultant.  (See Pl.'s Opp'n Mem. Ex. T

(Williams Report).)  In preparing his report, Mr. Williams reviewed the deposition

testimony of numerous witnesses, including Officers Burton, Curet, and Whitmore, Judge

Ceisler, and Commissioner Johnson.  Based on this information, the report opines that the

Department "fail[ed] to appropriately train police officers in the accepted procedures"

regarding foot pursuits.  (Id. at 6 (stating that the review of the deposition testimony of a

Philadelphia Police Academy instructor demonstrated "a lack of procedural knowledge or

professional concern" and a "fail[ure] to educate officers" on foot pursuits).)  This failure

to train is not limited to the Academy and allegedly extends to the in-service training

programs as well.  (Id. ("[T]he [Department] grossly failed to conduct departmental

mandated yearly in-service training updates to maintain police proficiency in patrol duties

including Foot Pursuit Procedures.").)

The report concludes Pelzer's death was "a foreseeable result of failure" to

institute foot pursuit tactics.  (Id. at 7.)  This failure is the alleged result of a deliberate

indifference to the need for improved police procedures.  Quoting the IAO report's

-14-

statement that "[p]olice officers should ensure their actiosn do not precipitate the use of deadly force by placing themselves or others in jeopardy by taking unnecessary, overtly aggressive, or improper actions," the Williams report asserts that the Department failed in this "important mandate."  (Id.)  "A reasonable and well trained, experienced and prudent thinking Police Executive Administrator" would have given greater attention to the statistics and evidence contained in the IAO report.  (Id.)

## II. Standard of review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" when it could affect the outcome of the case under the governing law.  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply

by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must view the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Anderson, 477 U.S. at 255.  The court must decide not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252.  If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's version of events against the opponent, even if the quantity of the moving party's evidence far outweighs that of its opponent.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

-16-

### III. Discussion

#### A. Excessive force claim against Officer Burton

Officer Burton argues that the excessive force claim should be dismissed because (1) he did not violate Pelzer's Fourth Amendment rights and (2) he is entitled to qualified immunity under these facts.  Neither argument is persuasive, and I will deny the motion as to this point because there is a genuine dispute over the reasonableness of Burton's belief in the need to use deadly force.

##### 1. Was there a violation of Pelzer's constitutional rights?

The use of deadly force implicates a citizen's Fourth Amendment right to be free from unreasonable seizures.  See Graham v. Connor, 490 U.S. 386, 395 (1989) ("[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment . . . .").  Though a citizen is seized by the use of deadly force, such conduct does not constitute a *per se* Fourth Amendment violation.  As the constitutional text provides, the question is whether the use of deadly force was unreasonable.  See Estate of Smith v. Marasco, 318 F.3d 497, 515 (3d Cir. 2003) ("To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." (quoting Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999))).

The Third Circuit Court of Appeals set forth the following test for determining the

reasonableness of a law enforcement officer's use of deadly force: "[W]as it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others?" Abraham v. Raso, 183 F.3d 279, 290 (3d Cir. 1999). The court must consider the officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396–97.

Evaluations of these claims must allow "for the fact that police officers are often forced to make split-second judgments–in circumstances that are often tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Id. The highly factual nature of this determination requires consideration of factors such as the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Abraham, 183 F.3d at 290 (quoting Graham, 490 U.S. at 396).

In light of this standard, I will deny the motion as to this part. Officer Burton is not entitled to summary judgment because the key facts of what Pelzer was doing before he was shot and whether he ever raised his right hand towards the officer are still contested. Burton's argument rests primarily on his contentions that Pelzer refused to comply with his orders to show his hands, was rocking back and forth, kept his right hand under his shirt, and then moved his right hand quickly towards the officer while grasping

-18-

an object believed to be a gun.  (Defs.' Mem. for Summ. J. at 7–9.)  If the court were to credit this version of the facts as true, the officer's argument might gain significant traction,[13] but this would be contrary to the applicable standard of review.

The court must view the facts and draw reasonable inferences in favor of the non-movant.  To that end, I note that the plaintiff has presented testimony stating Pelzer did nothing up until the moment he was shot.[14]  This fundamentally contradicts Officer Burton's statement that Pelzer suddenly thrust his right hand forward immediately before being shot.  Assuming the non-movant's testimonial evidence is true, the potential reasonableness of Burton's decision to shoot is thrown into serious doubt.  From Burton's testimony, it appears his decision to shoot was primarily triggered by that single observation, and this crucial fact has now been thrown into dispute by this additional testimony.[15]

---

[13] Even though the officer did not know what Pelzer was wanted for outside of the fact he was trying to avoid being taken into custody, Officer Burton was understandably on guard when approaching Pelzer.  The officer interpreted the fact that Pelzer held the right side of his pants while running as a potential indication he was armed.  When Pelzer was finally cornered and ordered to stop running, he refused to show signs of surrender.  He kept his hands under his shirt.  He rocked back and forth, thereby preventing the officer from being able to determine whether there was any telltale gun-shaped bulge.  Finally, Officer Burton fired his gun only after he saw Pelzer make a sudden movement with his right hand from beneath his shirt towards the officer.

[14] The transcript reads:
Q.:     [Mr. Frost] When you heard the shot, you saw Mr. Pelzer go down?
A.:     [Officer Curet] That's correct.
Q.:     But prior to hearing the shot, you didn't see Mr. Pelzer move in any fashion?
A.:     No.
(Curet Dep. 87:14-20)

[15] Officer Burton's belief in the necessity of exercising deadly force is not well supported by the remaining facts in his deposition testimony.  Even assuming Pelzer made no sudden movement towards

The defendants also argue that Officer Curet's testimony has no bearing on this claim because he had no view of the escalating situation between Burton and Pelzer.  I disagree.  The defendants read Curet's deposition testimony as providing a clear answer on how the blue tarp affected his ability to observe the scene.  On the contrary, the testimony lacks the purported clarity and leaves open several questions on what Curet could see.

In one part, Officer Curet stated the tarp blocked his view of Pelzer's mid-section, but he could still see the top and bottom parts of his body.[16]  He followed up, however, by adding that the tarp was not an obstruction; with certain adjustments,[17] he could see

---

Officer Burton and accepting the defendants' version of all other facts, Officer Burton is not entitled to summary judgment on this claim.  Pelzer's rocking movements and refusal to show his hands would be a failure to submit to the officer's authority, but falls short of establishing the basis for believing Pelzer was a safety threat.

>   The officer admits as much:
>
>   Q.:     [Mr. Frost] Is it fair to say, according to you, that what gave you the right to
>           use deadly force is when [Pelzer] thrust his hand forward with the cell phone
>           and pointed it in your direction?
>   A.:     With the object in his hand that appeared to be a firearm, yes.

(Burton Dep. 254:4–10.)

[16] The transcript reads:

>   Q.:     [Mr. Frost] So you can see the right side of [Pelzer's] face, is that correct?
>   A.:     [Officer Curet] That's correct.
>   Q.:     Could you see his body?
>   A.:     Partial.
>   Q.:     From where to where could you see his body?
>   A.:     From mid section, I could see over his had, and I could see his legs from the
>           bottom.
>   Q.:     Okay.  You could see –
>   A.:     So it was just the mid section that was kind of being obstructed by some tarp,
>           blue tarp that was there in the alleyway.

(Curet Dep. 62:23–63:13.)

[17]

>   Q.:     [Mr. Frost] Could you see the waist area at all?

-20-

Pelzer's entire body including his hands.[18]  In another section, however, Curet testified

that even as he went underneath the tarp while approaching Pelzer and Burton, he

maintained eye contact with Pelzer[19] and did not see him "move in any fashion" prior to

---

> A.:    [Officer Curet] No.
>
>           *      *      *
>
> Q.:    From your vantage point, could you look down and see the waist area or leg area?
>
> A.:    I could see the side—yeah, yes.  I would say yes.
>
> Q.:    So you could see that?
>
> A.:    Yes.
>
> Q.:    So you could see his whole body from where you were standing?
>
> A.:    Yeah, I had to do adjustments.  But, yes, I could see.
>
>           *      *      *
>
> Q.:    So if [the blue tarp] was hanging across and you were giving commands, how were you able to see Burton—I'm sorry, how were you able to see Pelzer if there was a blue tarp hanging across?
>
> A.:    It wasn't completely covering Mr. Pelzer.  I could see—you could still see.  I could see top and bottom.  All I got to do is adjust my view, and I could see the male.

(Id. 64:4–6, 64:13–23, 82:12–21.)

[18]

> Q.:    [Mr. Frost] Okay.  And then you say that [Pelzer] had both of his hands at his waist band area.  Do you see that?
>
> A.:    [Officer Curet] Right.  Waist area.
>
>           *      *      *
>
> Q.:    All I'm trying to find out is where his hands were in relationship to his waistband?
>
> A.:    I would say near his waist area on the right side, where I could see them.
>
> Q.:    And you could see his hands?
>
> A.:    Sort of, yes.  Obviously, yes.
>
>           *      *      *
>
> Q.:    What you remember is he had his hands to the right side of his body?
>
> A.:    I remember, because the way he was bladed, his hands were not like this, they were right by him, right tight close to his body.

(Id. 67:19–23, 69:10–18, 72:13–18.)

[19]

> Q.:    [Mr. Frost] So, therefore, when you went under the tarp, you could still keep your eye on what was going on in front of you; is that correct?
>
> A.:    [Officer Curet] That's correct.
>
>           *      *      *
>
> Q.:    So if you heard the shot and you're going under the blue tarp, couldn't you still see in front of you?

the shot.[20]

This deposition testimony presents both parties with colorable arguments as to what Officer Curet could or could not observe.  If a jury were to credit Curet's testimony, it is possible they could reasonably find Pelzer engaged in no conduct justifying Officer Burton's belief or actions.  Accordingly, I will deny the motion as to this part.

## 2. Qualified immunity

Officer Burton argues that even if the court determined his actions violated Pelzer's constitutional rights, he is entitled to qualified immunity and the plaintiff's claim should be dismissed.  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald,

---

> A.:   It depends.  I mean, you can go in—go down like this.  I wasn't going to–I could have went that way.  I don't recall which side I went.  I could have went blade, I could have went either way.  But I remember going underneath the tarp.
>                         *        *        *
> Q.:   So when you enter the blue tarp, did you maintain eye focus on the—Mr. Pelzer?
> A.:   Yes.  Yes.  I believe I did, yes.

(Id. 84:17–21, 85:3–12, 86:6–10.)

[20]

> Q.:   [Mr. Frost] What did you see Mr. Pelzer doing?  Didi you see him do anything different than what you saw before [you went under the tarp]?
> A.:   [Officer Curet] No, just constantly facing Officer Burton.
> Q.:   And not doing anything?
> A.:   Not doing anything.
>                         *        *        *
> Q.:   [P]rior to hearing the shot, you didn't see Mr. Pelzer move in any fashion?
> A.:   No.

(Id. 86:15–21, 87:17–20.)

457 U.S. 800, 818 (1982)).  It balances the interests in ensuring officials are held

accountable when they act irresponsibly in their positions while shielding them "from

harassment, distraction, and liability" when they act responsibly.  Id.

To determine whether this immunity applies, the Supreme Court provided a two-

step analysis in Saucier v. Katz, 533 U.S. 194 (2001).  First, "[t]aken in the light most

favorable to the party asserting the injury, do the facts alleged show the officer's conduct

violated a constitutional right?"  Id. at 201.  If the answer is no, then the inquiry is

concluded.  If, on the other hand, the plaintiff has satisfied the first step, the court "must

ask whether the right was clearly established."  Id.  Though the initial explanation of the

test included a directive that the analytical steps be kept in the order presented above, id.

(stating that the question of whether the facts alleged evidence a constitutional violation

"must be the initial inquiry), courts now have discretion to choose which part to address

first.[21]

### i. Officer Burton is not entitled to qualified immunity at this stage

I will deny the motion as to this part.  As discussed earlier, there are genuine

disputes regarding the material facts of whether Officer Burton violated Pelzer's Fourth

---

[21] In Pearson v. Callahan, the Court receded from insisting on the Saucier order of decision.  127 S.Ct. at 821.  Recognizing the risks of bad decisionmaking and the potential difficulty for "affected parties to obtain appellate review of constitutional decision that may have a serious prospective effect on their operations," accompanying the Saucier procedure, the Court provided the courts with the flexibility to determine in which order to proceed.  Id. at 820–21.  As the district courts and the courts of appeals are better positioned to determine the order of decisionmaking, they will be able to select the process best suited for "the fair and efficient disposition of each case."  Id. at 821.

Amendment rights.  At this stage, it cannot be determined whether Burton's belief in the need to employ deadly force was objectively reasonable.  In opposition to Burton's recitation of the facts, the plaintiff has presented testimony raising serious questions on what Pelzer was doing before he was shot.

A reasonable jury could find that Burton was not objectively reasonable in believing Pelzer presented an imminent, life-threatening danger to his safety.[22]  See Tennessee v. Garner, 471 U.S. 1, 11–12 (1985).  Because the court is unable to conclusively determine at this time that Burton did not violate Pelzer's constitutional rights, the inquiry is concluded and Burton is not entitled to qualified immunity at this time.

### B. Municipal liability claims against the City of Philadelphia

The plaintiff has brought a Monell claim and a failure to train claim against the City.  While the legal standards governing these claims are similar in many respects, I will consider the claims individually.

---

[22] The defendants argue that "no objectively reasonable officer would know that firing a single bullet into Mr. Pelzer under the same circumstances would be considered an excessive use of force and therefore violate the clearly established law."  (Defs.' Mem. for Summ. J. at 10-11.)  This argument fails.  The defendants misconstrue the issue.  The issue is whether an objectively reasonable officer would believe he or she was authorized to use deadly force under the same circumstances.

The defendants' argument fails to consider the plaintiff's version of the facts and the standard of review this court is to apply.  There is no need to recite all the relevant facts again, but I note the testimonial evidence presented by the plaintiff suggesting that (1) Officer Curet witnessed the event, (2) Pelzer's hands were by his waist, not under his shirt, and (3) Pezler made no movements up until Officer Burton discharged his gun.  Accepting these statements as true and drawing all inferences in the plaintiff's favor, there is a genuine question as to whether an objectively reasonable officer would believe it was necessary to shoot an individual who had run from the police but made no physical motions suggesting an imminent threat of serious injury.

### 1. <u>Monell</u> claim regarding municipal policy or custom

Municipalities and other government bodies may be sued under Section 1983 for constitutional rights violations.  <u>Monell v. New York City Dep't of Soc. Servs.</u>, 436 U.S. 658, 690–92 (1992).  Liability is imposed only when the government, "under color of some official policy, 'causes' an employee to violate another's constitutional rights."  <u>Id.</u>  The plaintiff must establish: (1) the municipality had a policy[23] or custom[24] that deprived him of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) his injury was caused by the identified policy or custom.  <u>Bd. of the County Comm'rs of Bryan County  v. Brown</u>, 520 U.S. 397, 403–04 (1997) (citing, *inter alia*, <u>Monell</u>, 436 U.S. at 690–91, 694).

Liability may not be imposed solely on a *respondeat superior* theory.  <u>Monell</u>, 436

---

[23] A municipal policy, for purposes of § 1983, is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a government] body's officers."  <u>Monell</u>, 436 U.S. at 690; <u>see also</u> <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 275 (3d Cir. 2000) ("Policy is made when a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict.") (citation omitted).  Such a policy "generally implies a course of action consciously chosen from among various alternatives."  <u>City of Okla. City v. Tuttle</u>, 471 U.S. 808, 823 (1985).  Limiting liability to identifiable policies ensures that municipalities are only liable for "deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  <u>Bd. of the County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 403–04 (1997).

[24] The absence of a policy does not thereby relieve a municipality of liability.  <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 851 (3d Cir. 1990).  A custom, while not formally adopted by the municipality, may lead to liability if the "relevant practice is so widespread as to have the force of law."  <u>Bryan County</u>, 520 U.S. at 404; <u>see also</u> <u>Bielevicz</u>, 915 F.2d at 851 (stating that a constitutionally deficient custom may be found to exist when "policymakers were aware of [similar] unlawful conduct in the past, but failed to take precautions against future violations").  This requirement should not be construed so broadly as to circumvent <u>Monell</u>: "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy..."  <u>Tuttle</u>, 471 U.S. at 823–824.

U.S. at 692.  The plaintiff must demonstrate the municipality, through one of its

policymakers, affirmatively proclaimed the policy (or acquiesced in the widespread

custom) that caused the violation.  See Watson v. Abington Twp., 478 F.3d 144, 155–56

(3d Cir. 2007) (quoting Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990)).  Where

the alleged custom is not itself unconstitutional, the plaintiff bears a comparably heavier

burden of establishing municipal fault and causation by more than proof of a single

incident.  Tuttle, 471 U.S. at 823–24; see also Shimoyama v. City of Philadelphia, 2008

WL 269483, at *2–3 (E.D. Pa. Jan. 29, 2008) (Giles, J.) (granting the municipality's

summary judgment motion on a Monell claim when the plaintiff presented no facts

indicating any municipal policymaker "knew of, condoned, or acquiesced in any alleged

unconstitutional behavior").[25]

Here, the argument is the City was deliberately indifferent[26] to the alleged

constitutional violations resulting from its failure to implement foot pursuit and partner

splitting policies, as recommended in the IAO report.[27]  (See Pl.'s Opp'n Mem. at 15–17.)

---

[25] Judge Giles later vacated this ruling upon the plaintiff's motion for reconsideration in light of belatedly produced materials bearing on his Monell claim.  See Shimoyama v. City of Philadelphia, 2008 WL 2412969 (E.D. Pa. June 9, 2008) (granting the motion for reconsideration with respect to the Section 1983 claim).  The later decision does not disturb the well-settled legal principles discussed in the prior memorandum.

[26] Although the deliberate indifference standard was originally used for suits alleging a failure to train police officers, this standard has been adopted in other municipal policy/custom liability cases.  See Beck v. City of Pittsburgh, 89 F.3d 966, 971–72 (3d Cir. 1996) (citing Simmons v. City of Philadelphia, 947 F.2d 1042, 1070 (3d Cir. 1991)).

[27] The plaintiff also indicates that the Williams Report identified "[the City's] failure to implement an adequate and police mandated policy for Police Foot Pursuit training" as "a substantial factor in [the] inappropriate procedures and poor judgment tactics used by the Philadelphia Police

Under these facts, I find that this argument is sufficient to allow this claim to survive.

Deliberate indifference is more than simple negligence.  It is "a deliberate choice to

follow a course of action [that] is made from among various alternatives" without regard

to the known or obvious consequences.  City of Canton v. Harris, 489 U.S. 378, 389

(1989) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483–84 (1986) (plurality)

(Brennan, J.)); Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000).

Accordingly, to survive summary judgment under this standard, the plaintiff must

produce facts tending to show the City knew of a pattern of constitutional violations or

that such consequences were so obvious the City's conduct can only be characterized as

deliberate indifference.  See, e.g., Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir.

1990).  Based on the parties' memoranda and the record, I believe a reasonable jury could

find the City was deliberately indifferent.  Even though the IAO report raised no

questions regarding the constitutionality of police pursuit or post-pursuit conduct, it raised

serious questions regarding officer conduct and the violation of basic safety principles.

For the reasons that follow, I will deny the motion as to this claim.

### i. The IAO report did not place the City on notice of any pattern of violations

---

Department in the pursuit of Raymond Pelzer, as he fled from the scene of persons involved in a
gambling incident."  (Williams Report at 7.)  The report opines that Department supervisors "purposely
disregarded" the need to train officers on accepted procedures regarding foot pursuit safety as well as the
statistics and conclusions in the IAO report.  (Id. at 5, 7.)  As a result of these alleged policy failures, the
City became the moving force behind Officer Burton's actions violating Pelzer's Fourth Amendment
rights.

The plaintiff's argument based on the IAO report is insufficient to survive summary judgment.  She has skipped the necessary step of demonstrating the report's discussion of pursuit-related *injuries* alerted or should have altered the City to a pattern of pursuit-related *constitutional rights violations*.  While an injury may be a necessary part of a constitutional violation, it is not sufficient by itself to label an act unconstitutional.  In the face of this dearth of evidence suggesting the documented injury statistics indicated unconstitutional conduct, the court cannot reasonably infer the City was deliberately indifferent to any constitutional violations.

The IAO report's aim was to determine the current policies, assess compliance, and compare the current policies with "the model guidelines of best practices."  (Ceisler Dep. 124:5–15.)  It neither states nor suggests the lack of a foot pursuit or partner splitting policy was the cause of any known or foreseeable pattern of violations by Philadelphia officers.  It presented no information or analysis on how many Philadelphia police shootings violated the constitutional rights of citizens.  Ceisler, IAO Report at 14 ("The extent to which the officer-involved shootings that resulted in fatalities are excessive or unreasonable cannot be determined from these raw statistics alone.  The question in each case is whether, in light of all the facts and circumstances surrounding each shooting incident, the officer(s) reasonably believed that the use of deadly force was necessary to prevent imminent death or serious bodily injury to the officer or another person.").)  Consequently, though it noted a high correlation between foot pursuits,

officer-involved shootings, and injuries to officers or pursuit subjects, the IAO report

made no findings or conclusions regarding the constitutional or statutory implications of

those incidents or injuries.  To then speculate on the basis of this data that the City

acquiesced in a known pattern of unconstitutional practices (or any legal practices tending

to lead to constitutional violations) goes beyond what has been placed in the record.[28]

My review has uncovered no evidence regarding the constitutionality of

Philadelphia police-involved shootings, pursuits, or any combination of the two.[29]

Without such data, the claim cannot proceed on this basis.  The plaintiff has had an

opportunity to conduct discovery regarding Philadelphia police practices, and at the

summary judgment stage, she has been unable to present evidence of any unconstitutional

patterns or practices.

### ii. The risk of danger was arguably obvious

Monell liability may still lie in the absence of a demonstrated pattern of

constitutional violations when the need for particular government action "is so obvious,

and the inadequacy of existing practice so likely to result in the violation of constitutional

---

[28] I also note that the IAO report states that "[t]he data for the period of 1998–2003 suggest[s] that Philadelphia police officers have been reasonably restrained in their use of firearms."  Ceisler, IAO Report at 29.  The department's policy was found to be consistent with federal and state constitutional standards.  Id. at 34.

[29] The Williams Report necessarily suffers from the same infirmities as it builds upon the same materials already in the record.  The report concludes the City exhibited "a deliberate indifference to a serious need in police procedure," but presents no facts or allegations suggesting a causal connection to any prior patterns of unconstitutional police conduct.  (See Williams Report at 7.)  Mr. Williams' experience notwithstanding, merely stating that an entity was deliberately indifferent is wholly insufficient to defeat the summary judgment motion.

rights, that the policymaker can reasonably be said to have been deliberately indifferent to

the need."  Natale v. Camden County Correctional Facility, 318 F.3d 575, 584 (3d Cir.

2003) (quoting Bryan County, 520 U.S. at 417–18).

Though drawn from a different context, language explaining deliberate

indifference with respect to failure-to-train claims has been used generally and is

instructive on what kinds of consequences are obvious or not.  The Court has stated that

courts should consider "[t]he likelihood that [a] situation will recur and the predictability

that an officer lacking specific tools to handle that situation will violate citizens' rights . .

. ."[30]  Bryan County, 520 U.S. at 409.  Failure to act in the face of such consequences

could justify finding policymakers were deliberately indifferent to the obvious risks of

their choice.  This indicates recurrence, apparentness, and the likelihood of constitutional

injury are a few of the factors to be taken into account.  See, e.g., Walker v. City of New

York, 974 F.2d 293, 297–98 (2d Cir. 1992) (laying out the following three-factor test:

"(1) municipal policymakers know that employees will confront a particular situation; (2)

the situation involves a difficult choice or a history of employees mishandling; and (3) the

wrong choice by an employee will frequently cause deprivation of constitutional rights.");

see also Natale, 318 F.3d at 584–85 ("A reasonable jury could conclude that the failure to

establish a policy to address the immediate medication needs of inmates with serious

---

[30] The often-cited example for deliberate indifference in the face of obvious constitutional risks is
the hypothetical arming of police officers without providing training on the constitutional limits on using
firearms.  See City of Canton, 489 U.S. at 390 n.10.

medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs.")

In the Third Circuit, <u>Monell</u> liability may also be present where a failure to protect against "simple mistakes" was likely to lead to constitutional violations. In <u>Berg v. County of Allegheny</u>, the appellant was improperly arrested pursuant to an erroneously issued arrest warrant. 219 F.3d at 266–67. The problem was a clerical error by which the last two numbers of the intended subject's criminal complaint number were transposed. <u>Id.</u> The warrant clerk testified at a deposition that over the preceding five years, during which 500 warrants were issued each month, no problem like this had ever arisen. <u>Id.</u> at 267.

The district court had granted the county's motion for summary judgment on the plaintiff's <u>Monell</u> claim of deliberate indifference. The Third Circuit reversed this aspect of the decision. It noted that nothing in the record indicated "any evidence of procedures guarding against . . . mistakes." <u>Id.</u> at 276. The court further recognized that the current warrant system "employed a design where the slip of a finger could result in wrongful arrest and imprisonment." <u>Id.</u> at 277. Because of the high volume of arrest warrants issued and the fact that a simple mistake so easily led to a constitutional violation, the failure to provide protective measures and fail safes against these kinds of clerical mistakes was comparable to "a failure to equip law enforcement officers with specific tools to handle recurring situations." <u>Id.</u> (quoting <u>Bryan County</u>, 520 U.S. at 409)

(internal quotation marks omitted).

Here, there was no stated policy or custom, but a reasonable jury could find the failure to establish pursuit policies creates a sufficiently obvious risk to the rights of pursuit subjects.  Foot pursuits are hardly uncommon for a police force serving a city as large and populous as Philadelphia.  Accepting this statement as true, the failure to provide a policy or guidelines could be considered an apparent or obvious omission.  A jury may also be able to conclude that the issue of pursuit and patrol policies are the result of a policymaker's decision, and that the City's omission was the moving factor behind the plaintiff's injury.

The plaintiff has produced evidence highlighting problems with the Academy training program.  The IAO report clearly states that the current training system was inadequate at best.  Ceisler, IAO Report at 61.  A more negative assessment characterizes the training program as offering "virtually no training in foot pursuits."  Id. at 62.  More concrete examples of officer decision-making are evident in the report.  While gathering the data and facts for her report, Judge Ceisler spoke with Philadelphia police officers and commanders and presented them with certain case studies where officers engaged in pursuit and made decision ultimately increasing the otherwise preventable risks of death or serious bodily injury.  Id. at 61.  When she asked these individuals what they thought of the case study officer's decisions, many of them approved of the officer's tactics, which violated basic safety principles.  Id.  As a result, the report suggests that "officers

and supervisors are not adequately trained or given clear direction on the appropriate response to situations." Id.

A reasonable jury could conclude the City ignored a serious and apparent risk resulting from a failure to institute policies addressing deficiencies in existing practices. As the IAO report stated, "In several cases, where suspects were killed and officers were seriously wounded, the officers took these questionable actions in situations where no crimes had been committed, where no innocent persons were in danger, or where officers had no legal basis for initiating a search or arrest in the first place." Id. at 60.  This suggests that even assuming the current use-of-force training is sufficient, it has not been enough to prevent the initial tactical decisions that later placed the officers in situations unnecessarily increasing the danger to all parties.[31]  Id.  Though this evidence falls short of indicating a pattern of constitutional violations, a reasonable jury could find there was a known need for a new policy to counter the emotion-driven aspects of a pursuit, especially when an officer's decisions can directly increase or decrease the threat of imminent death or serious bodily injury.[32]

---

[31] The Williams Report also indicates that the City failed to implement policies preventing officers from precipitating the use of deadly force during pursuits.  (Williams Report at 7.)  Furthermore, the City allegedly failed to establish policies on monitoring police pursuit practices.  (Id. at 6.)

[32] In this way, the constitutional implications of these facts are arguably analogous to those in Berg.  The defendants allegedly failed to employ or teach basic protective measures to address apparently obvious policy deficiencies.  Philadelphia officers were trusted to rely on their training and experience before engaging in pursuit, but when one or both are lacking, officers are arguably unprepared to fulfill their duties.

I recognize that the immediacy of a constitutional violation resulting from mistakes made during a pursuit is slightly more attenuated than the situation in Berg.  The mere fact that an officer fails to call

For these reasons, I believe there is a genuine issue regarding the obviousness of a need for additional patrol policies.  The plaintiff's evidence raises serious questions regarding officer training.  Though the officers were given extensive instruction on the use of force, the focus on foot pursuits was allegedly wanting.  Given the serious risks and regularity of foot pursuits, a jury may find the City was deliberately indifferent to the adequacy of existing practices and the need for new or additional policies.  Because the plaintiff has produced sufficient evidence to raise a question regarding the need for additional policies, I will deny the motion as to this point.

### 2. Failure to train claim

In <u>City of Canton v. Harris</u>, the Supreme Court held that a municipality may be liable for failing to train its employees when that failure evidenced a "deliberate indifference to the rights of persons with whom [the municipal employees] come into contact."  489 U.S. 378, 389–90 (1989).  "A municipality's deliberately indifferent failure to train is *not* established by (1) presenting evidence of the shortcomings of an individual; (2) proving that an otherwise sound training program occasionally was negligently

---

for back-up or decides to turn one more corner instead of opting to contain the subject does not trigger a violation.  The plaintiff's argument, however, is that these "errors" place officers in positions where the *danger* of a violation becomes markedly greater, making the use of force more of a foregone conclusion.  This is the same type of scenario predicted in the IAO report.

 The defendants' primary argument appears to be that the use of force by Philadelphia officers has been reasonable and constitutional.  But if officers regularly engage in practices creating a need to use force, as alleged by the plaintiff, the defendants' argument cuts too fine of a line between the realms of constitutional and unconstitutional conduct and what actions can form the basis of Section 1983 liability.  Because of this link between pursuit decisions, a risk of harm, and the injury here, dismissing the claim for the reasons set forth by the defendants would be imprudent.

administered; or (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct." Simmons v. City of Phila., 947 F.2d 1042, 1060 (3d Cir. 1991). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [the Court's] prior cases—can a city be liable for such a failure under § 1983." City of Canton, 489 U.S. at 389.

The focus is on "the adequacy of the training program in relation to the tasks the employees must perform." Id. at 389–90. Mere allegations that the municipality should have or could have incorporated other training programs are insufficient. Id. at 391. Additionally, "[arguments] that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability . . . for the officer's shortcomings may have resulted from factors other than a faulty training program." Id. at 390–91.

I will deny the motion as to this part. A reasonable jury could find the City was deliberately indifferent to the scope of officer training. The plaintiff has presented sufficient evidence indicating the City may have had reason to know its current patrol training was inadequate to prepare officers to carry out their duties safely and effectively.

As discussed earlier, the IAO report raises questions regarding the training system. Ceisler, IAO Report at 61. The report suggests the current program offers "virtually no training in foot pursuits." Id. at 62. This was seemingly confirmed by Judge Ceisler's discussions with Philadelphia police officers and commanders who largely favored pursuit tactics violating basic safety principles by increasing the risk of death or serious

bodily injury.  Id. at 61.  The report also found evidence of "significant internal disagreement as to what constitutes sound tactics, good judgment, and appropriate responses."  Id.  As a result, the report suggests that "officers and supervisors are not adequately trained or given clear direction on the appropriate response to situations."  Id. From this evidence, a reasonable jury could infer that the City and Department were failing to provide standardized (or even comprehensive) instruction on fundamental police conduct and safety with respect to pursuits.

The nature of an officer's duties makes risk of injury a constant threat, whether to himself or to others.  Society rightfully expects these officers to perform their jobs in a manner that emphasizes officer and public safety.  To perform at that level, officers must be given the proper tools and know-how to make the right decisions.  The IAO Report strongly suggests the City failed in this regard and that inadequate training makes it more likely officers will make decisions increasing the risk of death or serious bodily injury rather than minimizing it.  This factual dispute regarding the ability of the current training program to prepare Philadelphia officers or whether the City turned a blind eye to a known deficiency cannot be answered at this point and is better left to the factfinder. Based on this evidence, the plaintiff has presented enough evidence to demonstrate the existence of a genuine issue of material fact on the failure to train claim, and the motion will be denied as to this part.

**C. Supervisory liability claim against Commissioner Sylvester Johnson**

I will deny the motion as to this claim.  The standards for failure to supervise and failure to train claims are similar to those used for municipal liability: the plaintiff must either show the supervisor was directly involved in the conduct giving rise to the action, or exhibited deliberate indifference.  See Carter, 181 F.3d at 357. The plaintiff proceeds on a deliberate indifference theory only.  (See Pl.'s Opp'n Mem. at 17–19.)

Supervisory indifference may be established where the potential for injury was clearly apparent.  Sample, 885 F.2d at 1118 ("Similarly, deliberate indifference to a known risk will ordinarily be demonstrated by evidence that the supervisory official failed to respond appropriately in the face of an awareness of such injuries.").  To proceed on this variant of the claim, the plaintiff must establish that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."  Carter, 181 F.3d at 357 (citing Walker v. City of New York, 974 F.2d 293, 297–98 (2d Cir. 1992)) (footnote omitted).

As discussed earlier, foot pursuits are likely a common aspect of a Philadelphia officer's duties.  This makes the need to train and supervise their actions all the more important because of the inherently physical nature of a foot pursuit.  Additionally, the urban landscape of Philadelphia likely presents interesting tactical questions of when to pursue an individual and when not to.  Given these important considerations, officers

needed to be trained to handle these issues, and their supervisors had a responsibility to ensure the necessary training was provided.

The substance of the previous discussion regarding the claims against the City is equally applicable here, and I incorporate it here by reference.[33]  Though Commissioner Johnson had an opportunity to review the report and its recommendations, he took no action nor believed any was necessary with respect to a foot pursuit policy or training. The IAO report provided information strongly indicating the current training program was inadequate.  Ceisler, IAO Report at 60–62.

Johnson believed officers who were trained at the Academy and had the benefit of on-the-job experience would be able to make prudent patrol decisions.  (See Johnson Dep. 37:6–38:1.)  Specific rules would be a futile exercise given the spontaneous nature and numerous variables of a foot pursuit.  The IAO report, however, suggests otherwise and indicates officers are not sufficiently trained to make the right pursuit decisions. Resolution of this factual this question is better left for the finder of fact, and I will deny the motion as to this part.

**D. State law claims**

As to the plaintiff's state law claims, I will deny the defendants' motion in part and

---

[33] In particular, the discussions in III.B.1.ii. and III.B.2 on the alleged deliberate indifference displayed in spite of the IAO Report's warnings are pertinent here.

grant it in part.  The complaint brings wrongful death[34] and survival claims[35] against all

defendants and additional claims for battery[36] and assault[37] against Burton.  The

defendants claim immunity under the Pennsylvania Political Subdivision Tort Claims Act

(PSTCA).

The PSTCA provides legal immunity for government bodies and their employees

unless their actions fall within certain enumerated exceptions.  See 42 Pa. Con. Stat. Ann.

§ 8541 (immunizing government agencies from liability for damages caused by any act by

the agency or an agency employee, subject to the exceptions); § 8545 (providing

conditional legal immunity to agency employees for any injuries caused by conduct taken

within the scope of employment).

An agency employee loses PSTCA immunity if his conduct constituted a "crime,

actual fraud, actual malice or willful misconduct."[38]  42 Pa. Con. Stat. Ann. § 8550.  The

---

[34] Pennsylvania law provides that a wrongful death suit may be brought "for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime."  42 Pa. Con. Stat. Ann. § 8301(a).

[35] Pennsylvania's survival law merely provides that "[a]ll causes of action . . . shall survive the death of the plaintiff . . . ."  42 Pa. Con. Stat. Ann. § 8302.

[36] "[A] battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."  Boyd v. Kissinger, 2008 WL 2550584, at *6 (E.D. Pa. June 26, 2008) (O'Neill, J.) (quoting Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994)).

[37] An assault is "an intentional attempt by force to do an injury to the person of another . . . ."  Id.

[38] Unlike the agency immunity exceptions, there are no restrictions on what attendant factual scenarios open the door to liability.  See 42 Pa. Con. Stat. Ann. § 8542(b).  It is simply enough if the employee's conduct itself is sufficiently culpable.

plaintiff has only argued that Officer Burton's conduct amounted to willful misconduct.  I

will deny the motion as to this part.

Willful misconduct is "conduct whereby the actor desired to bring about the result

that followed or at least was aware that it was substantially certain to follow, so that such

desire can be implied."  Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994).  The

conduct must be "carried out with the intention of achieving exactly that wrongful

purpose."  Jones v. City of Philadelphia, 893 A.2d 837, 843 (Pa. Commw. Ct. 2006)

(citing In re City of Philadelphia Litigation, 938 F. Supp. 1264 (E.D. Pa. 1996)).

Where a police officer uses excessive force in making an arrest, he or she may be

held liable for assaulting or battering the detainee.  Id.  Similar to a Fourth Amendment

claim, the officer's liability will hinge on the reasonableness of the force used.  Id.  Due

to the factual disputes regarding the plaintiff's Fourth Amendment excessive force claim,

the court cannot determine whether Officer Burton's actions were the product of willful

misconduct.  Boyd v. Kissinger, 2008 WL 2550584, at *6 (E.D. Pa. June 26, 2008)

(O'Neill, J.) (quoting Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994)); Fulks ex

rel. Daniel v. Gasper, 439 F. Supp. 2d 372, 378–80 (M.D. Pa. 2006).  Accordingly, the

motion will be dismissed with respect to Burton.

The state law claims against Commissioner Johnson will be dismissed.  Because

Johnson's actions were within the scope of his duties as Commissioner, he is entitled to

claim immunity to these state law claims.  Unlike Officer Burton, Johnson's conduct with

respect to this matter cannot be colored as constituted a crime, fraud, actual malice, or

willful misconduct.  The plaintiff has presented no argument suggesting otherwise.

The government agency's immunity is subject to the exceptions provided in 42 Pa.

Con. Stat. Ann. § 8542(a), which reads:

> A local agency shall be liable for damages on account of an injury to a
> person or property within the limits set forth in this subchapter if both
> of the following conditions are satisfied and the injury occurs as a result
> of one of the acts set forth in subsection (b):
>
> (1) The damages would be recoverable under common law or a
> statute creating a cause of action if the injury were caused by a
> person not having available a defense under section 8541 (relating
> to governmental immunity generally) or section 8546 (relating to
> defense of official immunity); and
>
> (2) The injury was caused by the negligent acts of the local agency
> or an employee thereof acting within the scope of his office or
> duties with respect to one of the categories listed in subsection (b).
> As used in this paragraph, "negligent acts" shall not include acts or
> conduct which constitutes a crime, actual fraud, actual malice or
> willful misconduct.

Subsection (b) provides eight specifically designated exceptions.  They are : (1) vehicle

liability, (2) care, custody, or control of personal property, (3) real property, (4) trees,

traffic controls, and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks,

and (8) care, custody, and control of animals.  Id. § 8542(b).  Therefore, the agency may

be subjected to liability if the conduct giving rise to the action can be attributed to it or

one of its employees, was negligent, and falls within one of the eight exceptions.

In light of these conditions, the state law claims against the City will be dismissed.

Not one of the § 8542(b) exceptions is applicable here, and the plaintiff had made no suggestions that any applies.  Even though an individual employee's immunity may be stripped away by action for "willful misconduct," section 8542 has no affect on the employing government body's immunity.  42 Pa. Con. Stat. Ann. § 8542(a); see also Cooper v. City of Chester, 810 F. Supp. 618, 626 n.8 (E.D. Pa. 1992).  Moreover, the plaintiff has presented no arguments suggesting the City's actions or those of any employee constituted negligence.

**IV. Conclusion**

For the foregoing reasons, I will grant the motion for summary judgment in part and deny it in part.  An appropriate Order follows.