IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LESLIE C. PELZER | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | NO. 07-CV-0038 |
| Defendants. | : | |

**MEMORANDUM OPINION**

**TIMOTHY R. RICE**                                                                                                                                                             January 10, 2011
**U.S. MAGISTRATE JUDGE**

      Defendant Marvin Burton seeks a new trial after a jury found him liable under 42 U.S.C. § 1983 for using excessive force when he fatally shot Raymond Pelzer on April 27, 2006. Burton claims I improperly allowed the jury to hear testimony that Pelzer was unarmed when Burton killed him. Burton argues such testimony was irrelevant and, in the alternative, unfairly prejudicial.

      I will deny Burton's motion. The evidence at issue was relevant to the jury's determination of the circumstances leading up to Pelzer's shooting because it helped the jury resolve a critical credibility issue, and the probative value of the testimony was not substantially outweighed by the risk of unfair prejudice or confusion. See Fed. R. Evid. 403.

I.    Background

    A.    Factual History

      Just before 5:30 p.m. on April 27, 2006, Philadelphia Police Officer Kenora Scott[1] and

---

[1] Scott is now a Police Sergeant. See October 4, 2010 Transcript of Jury Trial at 128, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Oct. 4, 2010), ECF No. 107 [hereinafter Oct. 4 Tr.].

her partner conducted an investigatory stop of three men at the intersection of Millick and Market Streets. Oct. 4 Tr. at 140-41, 151. One of those men was Raymond Pelzer. Id. at 141. Although he "had not committed any major violation of the law," id. at 144-45, Officer Scott frisked Pelzer to determine whether he had any weapons. Id. at 145-46. He was unarmed. Id. at 146. Pelzer provided Officer Scott with his identification, and she radioed dispatch his name and address to determine whether he was the subject of any warrants. Id. at 146-47.

Before Officer Scott received a response to her query, Pelzer ran. Oct. 4 Tr. at 150. Officer Scott and her partner began to chase Pelzer, who was heading north on Millick Street, and Officer Scott radioed for assistance. Id. at 152-54. After Pelzer fled, Officer Scott was advised there was a warrant for his arrest, but she received no further details about the nature of the warrant or the reason it was issued. Id. at 152.

Officer Miguel Curet and his partner were on their way to the location of Officer Scott's investigatory stop when they heard of Pelzer's flight. See October 5, 2010 Partial Transcript of Jury Trial[2] at 8, 43-44, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Oct. 5, 2010), ECF No. 96 [hereinafter Oct. 5 Tr.]. Upon learning of the foot pursuit, Officer Curet and his partner headed toward the home address given for Pelzer over police radio. Id. at 44. Along the way, Officer Curet's partner spotted Pelzer running into an alley in the 5900 block of Filbert Street, so they began searching on foot. Id. at 44-45, 47-48. Officer Curet's partner secured the south end of the alley running north between Salford and Redfield Streets, while Officer Curet went north on Redfield Street. Id. at 47-48. Officer Curet found an alley running west from Redfield Street toward Salford Street and, when he reached the entrance, he could see Pelzer down the alley in a

---

[2]The partial transcript for October 5, 2010, only contains the testimony of Officer Curet.

backyard.  Id. at 48-49.  As he entered the alley, Officer Curet removed his gun from its holster.
Id. at 24.

Meanwhile, Burton and his partner were finishing an assignment nine blocks away.  See
October 6, 2010 Partial Transcript of Jury Trial[3] at 16, Pelzer v. City of Phila., No. 07-0038 (E.D.
Pa. Oct. 6, 2010), ECF No. 115 [hereinafter Oct. 6 Tr.].  Upon hearing of the foot pursuit, Burton
began searching on foot near the alleys where Officer Curet and his partner had reported seeing
Pelzer.  Id. at 20.  When Burton turned south on Salford Street from Arch Street, he saw Pelzer
attempting to climb over a gate to exit an alley next to 51 North Salford Street.  Id. at 34-35, 43-
44.  Pelzer retreated after seeing Burton, who kicked the gate open and chased Pelzer east
through the alley.  Id. at 39-41, 57, 61.  As he entered the alley, Burton drew his gun.  Id. at 62.

Until this point, there is no meaningful dispute about the facts.  However, Burton and
Officer Curet offered divergent accounts of what transpired in the backyard where they
encountered Pelzer.  These two versions of the events immediately preceding Pelzer's death were
at the heart of this trial, and are pivotal to the evidentiary determination at issue in Burton's
motion.

Burton testified Pelzer was holding his right waistband area as he ran back the alley,
causing Burton to suspect Pelzer might be armed.  Oct. 6 Tr. at 62-63, 116-17.  Burton lost sight
of Pelzer when Pelzer turned into the yard at the rear of 51 North Salford Street.  Id. at 74, 77, 81.
According to Burton, he peeked around the back edge of the house into the yard and saw Pelzer
attempting to climb over a fence into an adjacent backyard.  Id. at 51, 79, 81, 84, 191-92.  At that
time, both of Pelzer's hands were visible, and Burton admits they were empty.  Id. at 116, 126,

---

[3]The partial transcript for October 6, 2010, only contains Burton's testimony.

128. Burton entered the yard and ordered Pelzer to stop. Id. at 119, 122-23, 128, 137. Pelzer dropped from the fence and faced Burton, with his left foot slightly in front of his right foot. Id. at 137-39, 143-44. Burton testified Pelzer had his right hand at his waist, tucked under his shirt, and did not comply with verbal commands to show his hands.[4] Id. at 137, 143-45, 193. In addition, Burton stated Pelzer rocked back and forth, shouting "fuck you, fuck you, do it, do it." Id. at 140, 145, 193.

Perhaps most critically, Burton testified his short encounter with Pelzer[5] culminated in Pelzer taking his right hand from his waist area and thrusting it forward toward Burton. Oct. 6 Tr. at 142, 145. Burton stated he saw something silver in Pelzer's hand and thought it was a gun. Id. at 145-46, 159. According to Burton, he shot Pelzer in response to the thrusting gesture, and based on his belief Pelzer was pointing a gun at him. Id. at 159, 194-95.

The only silver object recovered on or around Pelzer's body after the shooting was a cellular phone. Id. at 146.

Officer Curet testified he had a view of Pelzer's right side as he approached the yard where Pelzer and Burton were facing off. Oct. 5 Tr. at 52. Although Officer Curet agreed Pelzer was facing Burton, id. at 27, 33, his other observations differed significantly from those described by Burton. First, Officer Curet testified both of Pelzer's hands were outside his shirt, near his waist at his right side, fully visible. Id. at 33-34, 52. Second, Officer Curet said Pelzer never lifted his right arm or otherwise moved his hands before he was shot. Id. at 32-34. Third,

---

[4] Burton stated Pelzer's left hand was at his side where Burton could see it. Oct. 6 Tr. at 142.

[5] Burton estimated his encounter with Pelzer in the backyard of 51 North Salford Street lasted ten to fifteen seconds. Oct. 6 Tr. at 197.

Officer Curet did not hear Pelzer shout anything at Burton before the shooting. Id. at 34. And finally, by Officer Curet's account, there was nothing silver -- indeed, nothing at all -- in Pelzer's hands. Id. at 66-67.

Officer Curet admitted a blue tarp was hanging across the alley between him and Pelzer, and he had to duck under the tarp as he approached the backyard. Oct. 5 Tr. at 52-53, 56. He also testified he did not see Burton fire his gun, and he only realized it was Pelzer who was shot when he saw Pelzer fall to the ground. Id. at 34, 66. However, Officer Curet maintained he never lost sight of Pelzer, even as he moved beneath the tarp. Id. at 33, 64-65.

B. Procedural History

Before trial, the defendants filed a motion in limine seeking to preclude evidence and testimony that Pelzer was unarmed. See Defendants' Motion in Limine to Preclude Evidence that the Plaintiff's Decedent was Unarmed, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Sept. 9, 2010). I denied the motion after full briefing and oral argument, finding such evidence was highly relevant, and its probative value was not substantially outweighed by any risk of unfair prejudice. See Transcript of Motions Hearing at 4-33, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Sept. 23, 2010), ECF No. 119 [hereinafter Motions Hr'g Tr.]; Order on Pretrial Motions, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Sept. 23, 2010). I did, however, offer to give a limiting instruction to the jury, and the defendants drafted such an instruction. See Motions Hr'g Tr. at 32-33; Defendants' Proposed Limiting Jury Instruction, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Sept. 28, 2010); Oct. 6 Tr. at 152-56. The limiting instruction emphasized the reasonableness of Burton's actions was to be evaluated based on what Burton knew or reasonably believed at the time he fired his gun, and that evidence Pelzer was unarmed only could be used to

5

assess the credibility of Burton and Officer Curet.  See Oct. 6 Tr. at 186-87.

During Burton's testimony, I read and explained the limiting instruction to the jury, id. at 186-87, and I repeated the instruction in my closing charge to the jury, see October 12, 2010 Transcript of Jury Trial at 27-28, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Oct. 12, 2010), ECF No. 125 [hereinafter Oct. 12 Tr.].  After deliberating for approximately two-and-one-half days, the jury returned a verdict finding Burton liable for using excessive force,[6] and awarded Mrs. Pelzer damages of $138,000.  See Civil Judgment, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Oct. 15, 2010).  Burton now seeks a new trial pursuant to Rules 59(a)(1)(A) and 60(b)(6) of the Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 7.1.

II.     Discussion

    A.     Legal Standard

I may "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has . . . been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  The broad language of Rule 59(a) permits a new trial "where there are prejudicial errors regarding the admissibility of evidence."  Mines v. City of Phila., No. 93-3052, 1995 WL 82515, at *2 (E.D. Pa. 1995) (citing Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993), and Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 187 (3d Cir. 1990)); cf. Brown v. Old Castle Precast East, Inc., No. 00-2549, 2003 WL 22999302, at *2 (E.D. Pa. Jan. 14, 2003) (including "a prejudicial error of law" among grounds meriting a new trial).

The decision to grant a new trial is wholly discretionary.  Lind v. Schenley Indus., Inc.,

---

[6]The jury found in favor of Burton on the state tort claims of assault and battery, and in favor of Johnson and the City on the claims against them.  See Civil Judgment, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Oct. 15, 2010).

6

278 F.2d 79, 88 (3d Cir. 1960); see also Barbee v. SE Pa. Transp. Auth., No. 04-4063, 2007 WL 675851, at *2 (E.D. Pa. Feb. 1, 2007) ("The decision to grant a new trial lies entirely within this Court's discretion."); Brown, 2003 WL 22999302, at *2 ("Granting or refusing a motion for new trial is a matter within the discretion of the district court."). My discretion in this regard is especially broad "when the reason for interfering with the jury verdict is a ruling on a matter that initially rested within [my] discretion," such as a ruling regarding the admissibility of evidence. Brown, 2003 WL 22999302, at *2; see Klein, 992 F.2d at 1289-90 (quoting Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980)); Barbee, 2007 WL 675851, at *2.

While broad, my discretion is not unfettered. Barbee, 2007 WL 675851, at *2. A new trial should be granted only where "a miscarriage of justice would result if the verdict was to stand." Id. (quoting Olefins Trading, Inc. v. Han Yang Chem. Corp., 9 F.3d 282, 289 (3d Cir. 1993)); see also Fed. R. Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."). I must consider "what is right and in the interests of justice." Lind, 278 F.2d at 88; see also Mines, 1995 WL 82515, at *2 ("In exercising its discretion, a district court may grant a new trial to prevent injustice.").

Thus, Burton must demonstrate my evidentiary ruling, permitting testimony that Pelzer was unarmed when killed, was not only erroneous, but was prejudicial, affected a substantial right, and resulted in a miscarriage of justice. Burton fails to satisfy this standard.

B.     Relevance

Burton first claims evidence showing Pelzer was unarmed at the time of his death was irrelevant to the excessive force claim against Burton. I do not share Burton's narrow view of

7

relevancy.

Evidence is relevant, and generally admissible, if it has "any tendency to make the existence of any fact that is of consequence to the determination of [an] action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; see Fed. R. Evid. 402; cf. Huddleston v. United States, 485 U.S. 681, 687 (1988) (noting the "broad principle that relevant evidence . . . is admissible unless the [Federal] Rules [of Evidence] provide otherwise"); Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 109-10 (3d Cir. 1999) ("Rule 401 does not raise a high standard."). This definition of "relevant evidence" must be "construed to secure fairness . . . to the end that the truth may be ascertained and proceedings justly determined." Fed. R. Evid. 102.

In a case alleging a police officer's use of force violated the Fourth Amendment, the ultimate question is whether the use of force was "'objectively reasonable' in light of the facts and circumstances confronting" him at the time. Graham v. Connor, 490 U.S. 386, 397 (1989); see Mines, 1995 WL 82515, at *3. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. This standard makes "allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97. It does not, however, prevent a plaintiff or a fact finder from questioning whether the officer's account of the circumstances surrounding a use of force is credible, or from critically assessing whether the officer's beliefs and perceptions leading to the use of force were reasonable. See id. at 398 n.12 (noting an officer's subjective motives may be

8

relevant to an assessment of his credibility, even though such motives are generally irrelevant to an "objective reasonableness" inquiry); Sherrod v. Berry, 856 F.2d 802, 806 (7th Cir. 1988) (en banc) (suggesting an officer's claim he shot a suspect after seeing an object resembling a gun could be challenged with evidence showing no such object was found).

Burton primarily relies on two cases in which courts have held "evidence or any information beyond that which [the officer] had and reasonably believed at the time he fired his revolver is . . . irrelevant, and prejudicial." Sherrod, 856 F.2d at 805; Mines, 1995 WL 82515, at *3. In both cases, however, the circumstances leading to the use of deadly force were not disputed, and the officers involved did not claim to have seen a gun or an object they believed was a gun.[7] See Sherrod, 856 F.2d at 805; Mines, 1995 WL 82515, at *1. Therefore, evidence the suspects in those cases were unarmed was not legitimately used to attack one version of events and bolster another, or to suggest a benign object like a cellular phone was unreasonably thought to resemble a weapon. See Sherrod, 856 F.2d at 806-07. Indeed, the Sherrod court explicitly limited its holding and distinguished a hypothetical case with facts strikingly similar to those presented here. See id. at 806 ("For example, if an officer testifies that 'I saw a shiny, metallic object similar to a gun or a dangerous weapon in the suspect's hand,' then proof that the suspect had neither gun nor knife would be material and admissible to the officer's credibility on the question of whether the officer saw any such thing . . . .").

---

[7]Additionally, in both cases cited by Burton, officers had information suggesting the suspects were armed. See Sherrod, 856 F.2d at 803 (involving a robbery suspect "who was probably armed and thus considered dangerous"); Mines, 1995 WL 82515, at *1 (involving suspects who mentioned a gun while committing a robbery). Here, Burton had no information about why Pelzer had been stopped or why he was the subject of a warrant. See Oct. 6 Tr. at 26-28; see also Oct. 4 Tr. at 152.

9

Here, the jury was presented with testimony from two police officers who offered distinct versions of the events leading to Pelzer's shooting. The officers' accounts differed with respect to some of the most critical aspects of the moments before Burton fired the fatal shot. Burton testified Pelzer had his hand concealed beneath his shirt at his waist, Oct. 6 Tr. at 137, 143-45, 193; Officer Curet testified Pelzer's hands were outside his shirt and visible, Oct. 5 Tr. at 33-34, 52. Burton testified Pelzer was shouting aggressively and using profanity, apparently daring Burton to shoot him, Oct. 6 Tr. at 140, 145, 193; Officer Curet testified he heard no such thing, Oct. 5 Tr. at 34. Burton testified Pelzer thrust his right hand forward, revealing a silver object resembling a gun, Oct. 6 Tr. at 142, 145-46, 159; Officer Curet was focused on Pelzer and said he made no movement at all, Oct. 5 Tr. at 32-34. These simple observations -- the last one, in particular -- were at the heart of Pelzer's excessive force claim.

To determine whether the use of deadly force against Pelzer was objectively reasonable, the jury had to decide which officer's version of events to believe. Evidence that Pelzer was unarmed is relevant to determine which account to credit. See Sherrod, 856 F.2d at 806-07; Bradford v. City of Modesto, No. 06-1214, 2009 WL 3489413, at *4 (E.D. Cal. Oct. 26, 2009) (finding evidence plaintiff was unarmed was probative of the credibility of witnesses offering different versions of events leading to the use of force at issue). Such credibility determinations are quintessential jury issues, and jurors need to know all of the surrounding circumstances -- within the bounds of Rule 403 -- to assist them. For example, the fact Pelzer possessed only a cellular phone "has the tendency to make some [aspects] of the conflicting versions more probable," and could impact a jury's assessment of whether it makes sense to believe Pelzer would have suddenly thrust his right hand in the direction of an armed police officer. Sherrod,

856 F.2d at 810 (Cummings, J., dissenting).

Moreover, even if the jury believed Burton, it is uncontested that the only silver object found on or near Pelzer after the shooting was a silver cellular phone. Oct. 6 Tr. at 146. The reasonableness of Burton's use of force, therefore, further depends on whether a reasonable officer would have mistaken that object for a weapon. See Sherrod 856 F.2d at 806-07; cf. Forbes v. Twp. of Lower Merion, No. 00-0930, 2003 WL 24292860, at *4-6 (E.D. Pa. Apr. 10, 2003) (denying summary judgment based, in part, on possibility that a jury would conclude suspect's walking stick did not reasonably resemble a shotgun or other weapon); Viera v. City of El Monte, No. 04-6082, 2006 WL 6626761, at *5 (C.D. Cal. May 2, 2006) (finding evidence suspect was unarmed irrelevant where the officer was not claiming suspect grabbed a gun or an item resembling a gun). The jury was entitled to know, for example, whether the silver object Burton saw was actually a small coin, a trombone, a cellular phone, or a realistic-looking toy gun. To determine whether an officer's use of force was reasonable where the officer testifies he saw an object he believed was a weapon, but later learned was not a weapon, a jury must consider whether a reasonable officer could have mistaken the item in question -- here, a cellular phone -- for a weapon. See Graham, 490 U.S. at 397 (requiring force used to be objectively reasonable, which is not assessed subjectively based on the officer's stated beliefs, but from the perspective of a reasonable officer on the scene); Sherrod, 856 F.2d at 806-07. Evidence showing Pelzer possessed only a silver cellular phone was highly probative of the reasonableness of Burton's stated belief he was in fear of death or serious injury when he shot Pelzer.

Accordingly, I exercised my discretion and admitted the evidence not to give the jury the unfair advantage of hindsight, but to permit the jury to effectively weigh the credibility of the

11

contradictory accounts of Burton and Officer Curet, and to assess the reasonableness of Burton's belief Pelzer presented a threat of imminent harm. See Motions Hr'g Tr. at 31-33.

    C.    Risk of Unfair Prejudice or Confusion

In the alternative, Burton claims the risk of prejudice or confusion presented by evidence Pelzer was unarmed substantially outweighed any probative value the evidence may have had. I disagree.

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403. Where a party objects to the presentation of evidence under Rule 403, the trial court has broad discretion to perform the necessary balancing test and determine admissibility. See Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008); United States v. Vosburgh, 602 F.3d 512, 537 (3d Cir. 2010); United States v. Balter, 91 F.3d 427, 442 (3d Cir. 1996).

In ruling before trial to admit evidence Pelzer was unarmed, I relied on the high degree of probative value such evidence had, and I determined any slight chance of unfair prejudice or confusion would be ameliorated by an appropriate limiting instruction. See Motions Hr'g Tr. at 32-33. Burton now endeavors to demonstrate unfair prejudice and confusion arose despite the limiting instruction by pointing to: (1) the number of times the jury was told Pelzer was unarmed; (2) the length of the jury's deliberation before reaching a verdict; and (3) certain questions asked by the jury during its deliberation. See Memorandum of Law in Support of Defendant Officer Marvin Burton's Motion for New Trial at 12-14, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Nov. 18, 2010).

As to Burton's first assertion, the evidence was not unfairly prejudicial simply because it

was repeated at various times throughout the trial in witness examinations and statements by plaintiff's counsel.[8] Jurors are presumed to follow the instructions they are given. See Greer v. Miller, 483 U.S. 756, 766 n.8 (1987); United States v. Givan, 320 F.3d 452, 462 (3d Cir. 2003). Here, the jury was twice given specific limiting instructions addressing the proper consideration of evidence Pelzer was unarmed. See Oct. 6 Tr. at 186-87; Oct. 12 Tr. at 27-28; see also Oct. 6 Tr. at 187 (offering additional explanation of the meaning of the limiting instruction and confirming the jury understood it). Burton's counsel requested, drafted, and consented to those instructions. See Motions Hr'g Tr. at 33; Oct. 6 Tr. at 152-56. Burton has not demonstrated the instructions he requested were somehow overcome by the number of references to evidence Pelzer was unarmed, and were therefore insufficient to prevent prejudice and confusion. See Hurley, 174 F.3d at 110, 112 (where evidence is highly probative, and where limiting instructions are given, it is not likely any prejudice will be unfair or will outweigh probative value).

      Burton's remaining assertions are essentially based on speculation about what was in the jurors' minds as they received the limiting instruction and deliberated. This trial was not short, and the issues decided by the jury were not easy. The jury heard six days of witness testimony, argument by counsel, and instruction on the law. When it deliberated, the jury was asked to consider the liability of three separate defendants and was given a verdict slip containing six questions, many of which were divided into subparts. See October 14, 2010 Transcript of Jury Trial at 20-22, Pelzer v. City of Phila., No. 07-0038 (E.D. Pa. Oct. 14, 2010). The two-and-one-

---

[8]As the Third Circuit has recognized, evidence is not properly excluded under Rule 403 simply because it is prejudicial, or detrimental to a party's case. See Carter v. Hewitt, 617 F.2d 961, 972, n.14 (3d Cir. 1980). Rule 403 is only concerned with unfair prejudice, which arises when evidence is likely to "cause a jury to base its decision on something other than the established propositions in the case." Id. at 972 (internal quotations omitted).

13

half days of deliberation and the questions asked by the jurors during their deliberation certainly underscore the fact that the jury's task was not a simple one. I cannot, however, infer from those facts that the jury was confused, or Burton prejudiced, by the admission of testimony showing Pelzer was unarmed when he was shot.

      An appropriate order follows.